UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
CORINTH KING,

                     *Plaintiff,*

        -against-

MICHAEL J. ASTRUE, Commissioner of
Social Security,

                     *Defendant.*
--------------------------------------------------------------x

MEMORANDUM
AND ORDER
09-CV-1244 (JG)

A P P E A R A N C E S:

        DOUGLAS C. J. BRIGANDI
                214-11 Northern Boulevard
                Suite 201
                Bayside, New York 11361
        *Attorney for Plaintiff*

        BENTON J. CAMPBELL
                United States Attorney
                Eastern District of New York
                271 Cadman Plaza East
                Brooklyn, New York 11201
        By:     Arthur Swerdloff
        *Attorney for Defendant*

JOHN GLEESON, United States District Judge:

                Corinth King sues the Commissioner of Social Security Michael Astrue under 42

U.S.C. § 405(g), seeking review of the Commissioner's decision that she is not entitled to a

period of Disability and Disability Insurance ("DDI") benefits under Title II of the Social

Security Act ("the Act"). The parties have cross-moved for judgment on the pleadings, the

Commissioner seeking affirmation of his final decision that King is not disabled and King

seeking a reversal. For the reasons that follow, the Commissioner's motion is denied and King's

motion is granted. The case is remanded solely for the calculation of benefits.

BACKGROUND

A.      *King's Claim of Disability*

       Corinth King was born in New York City on July 8, 1960, and is now nearly 50 years old.  King completed the tenth grade and did not obtain her GED.  She is a single mother of two daughters.  The older one was born when King was 15 years old.  In 1980, King began work as a traffic agent for the New York City Department of Transportation, a position she held for 17 years.  While employed as a traffic agent, King suffered injuries to her shoulder from directing traffic and carpal tunnel syndrome from writing traffic summonses.  In 1984, she was hit by a vehicle while working and was out of work for approximately nine months.  In 1992, King was in a car accident on the FDR Drive and suffered injuries to her shoulder, bleeding in her stomach, bruising on her chest and a ruptured pelvis.  She was out of work for nine months.  In February 1993, King was struck in the eye by a motorist who was upset with King's traffic direction.  King was out of work for four months as a result.

       In October 1995, King was working and was forced to jump out of the way of a moving bus.  In the process, King injured her left foot.  She went to work several times after the incident, but could not work for a consistent period of time without pain.  After about a year of working with her injury, King's supervisor told her that she could not keep coming to work with her injury.  King told her supervisor that she had to continue working in order to pay for her elder daughter's college tuition.  Thereafter, two of King's supervisors informed King that they could not have her working with her injuries because if something else happened to her they would be at fault.  As a result, they forced King to stop working.  At the time of her application,

King stated that she had pain in her left hand and wrist, in her forearm, upper arm and shoulder as well as in her left foot. She stopped working as of January 1997.

At the time of King's hearing in April 2006, King was living with her younger daughter. King is unable to walk more than a block and a half in New York City without pain. Prior to her injuries, King was able to rollerblade, go for bike rides, to the movie theater and baseball games with her youngest daughter. King is unable to participate in any of these activities as a result of her injuries. King can no longer walk the five blocks to church and is only able to attend church (which she does once a month) by taking the bus or taxi. She is unable to travel anywhere on the subway.

She cannot lift or carry more than five pounds and cannot sit for more than five or six minutes at a time without feeling tension in her back. She testified that she can stand for only seven minutes at one time and cannot hold a cup for a long period of time without it sliding out of her hand. King experiences pain at a level of seven on a ten point scale in her left and right ankle, left and right knee, back, buttocks, neck, shoulders and hands.

B.      *Procedural History*

On April 10, 1997, King applied for DDI benefits, claiming that she was disabled due to injuries to her left foot when she had to jump out of the way of the speeding bus in October 1995. R. 18, 182. It was the first application she filed with the Social Security Administration. R. 182. Her application was denied. R. 18. King then requested a hearing before an Administrative Law Judge ("ALJ"), which was held on April 22, 1998. R. 18. ALJ David Z. Nisnewitz found that King was not disabled. R. 18. King subsequently filed a request for review with the Appeals Council. R. 18. On January 5, 2001, the Appeals Council vacated

the hearing decision and remanded the case for further proceedings.  R. 18.  Another hearing was held on May 15, 2001 before ALJ Nisnewitz.  R. 18, 26.  On June 21, 2001, ALJ Nisnewitz again found that King was not disabled.  R. 19, 405.  On December 12, 2002 the Appeals Council denied King's request for review.  R. 405.

On April 20, 2004 Judge Nicholas Garaufis remanded King's case for further administrative proceedings and directed that a different ALJ be assigned.  In an order dated June 9, 2004, the Appeals Council remanded the case for proceedings before ALJ Manuel Cofresi.  R. 405.  On January 23, 2007, ALJ Cofresi denied the claim.  R. 405.  In July 2007, the Appeals Council again remanded the case for further proceedings.  R. 405.  A hearing was held on April 30, 2008.  R. 405.  On June 25, 2008, ALJ Cofresi found that King was not disabled from the period January 15, 1997 through June 30, 2002.  R. 407.  Specifically, ALJ Cofresi found that King had the residual functional capacity to perform the full range of sedentary work.  R. 409.  On January 22, 2009, the Appeals Council affirmed ALJ Cofresi's decision and extended his findings from June 30, 2002 through December 31, 2002.[1]

King filed a second complaint in this district on March 25, 2009, alleging that the Commissioner's decision is not supported by substantial evidence and that she is disabled.   The Commissioner now moves for affirmation of his final decision that King is not disabled and therefore is not eligible for benefits.  In a cross-motion, King seeks a reversal of the Commissioner's decision and a remand solely for the calculation of benefits.  Oral argument on the motions was held on October 2, 2009.

---

[1]        King claims that the Appeals Council did not have the authority to extend the ALJ's findings from June 30, 2002 through December 31, 2002.  It is undisputed that King was last insured on December 31, 2002.  As I am remanding the case for calculation of benefits due to King from January 15, 1997 through December 31, 2002, I need not address the challenge to the Council's authority to make findings of fact relating to a record not addressed by the ALJ.

C.     *Medical Evidence*

     1.     *Dr. Louis C. Rose -- Treating Orthopedic Surgeon*

Dr. Louis Rose, a board certified orthopedic surgeon, began treating King on March 6, 1996, for complaints of pain in her left ankle.  R. 249.  Rose treated King approximately every six weeks until at least 2002 and continued to see her until at least 2004.  R. 1524.  After an examination in March 1996, he reported that there was moderate swelling along the lateral ligament complex of King's ankle, along the medial aspect of the posterior to the medial malleolus as well as along the dorsal aspect of the proximal mid foot.  *Id.*  Dr. Rose determined that King was unable to come to neutral in dorsiflexion and lacked approximately five degrees of terminal dorsiflexion.  *Id.*  Rose also reported tenderness in various areas around King's leg.  Rose's impression was that King suffered from lateral ligament complex disruption with possible disruption of a portion of the deltoid ligament.  R. 250.  In October 1996, an MRI of King's left ankle revealed an abnormal amount of fluid surrounding the medial ankle tendons, extensive tenosynovitis, and a possible tear of the tendon.  R. 255.

In April 1997, King again saw Rose, who observed severe swelling along the lateral ligament complex, residual tenderness and decreased range of motion throughout.  R. 248.  His impression was that King suffered from status post lateral ligament complex rupture.  *Id.*  This impression remained the same through August of 1997, at which point Rose indicated King suffered from tenosynovitis of the flexor hallux longus as well.[2]  R. 243-47.  In August 1997,

---

[2]     Tenosynovitis of the flexor hallux longus refers to the inflammation of the tendon and the enveloping sheath of the long deep muscle of the fibular side of the leg.  *American Heritage Medical Dictionary* (2009), http://medical-dictionary.thefreedictionary.com/tenosynovitis; http://medical-dictionary.thefreedictionary.com/Flexor+hallucis+longus.

another MRI of King's ankle again revealed abnormal fluid in the ankle as well as flexor hallux longus tenosynovitis, confirming Rose's earlier diagnosis.

In September 1997, Rose indicated that, in addition to her previous symptoms, King had a posterior tibial tendon rupture in her right ankle. R. 242. At this time, Rose prescribed 600 mg of Daypro. *Id.* In December 1997, Rose examined King again. R. 378. Rose's impression was that King was suffering from post lateral ligament complex rupture with tenosynovitis of the hallux longus of the left ankle with possible intra-articular injury, possible tibial tendon rupture of the right ankle and possible internal derangement of the left knee involving the medial meniscus with sural nerve entrapment secondary to a transfer lesion. *Id.* In January 1998, Rose recommended, in addition, arthroscopic authorization for her left ankle and arthroscopic authorization for her left knee. R. 376. In February, March, April and June 1998, Rose's impressions of King's condition remained unchanged. R. 305-06, 369, 373-75.

In August 1998, Rose indicated that King's condition was essentially unchanged, except that King also suffered from L5 radiculopathy manifested into the left lower extremity.[3] R. 362. EMG results from July 1998 confirmed this diagnosis. R. 365. Rose's impressions in September 1998, October 1998, November 1998, January 1999, March 1999, May 1999, August 1999 and October 1999 after examining King remained essentially the same. R. 351-61. Rose generally advised that King continue to use a heating pad as well as avoid forceful or strenuous activity. *Id.,* 362.

---

[3]     Radiculopathy described a problem when one or more of the nerves are affected and do not function properly. This condition "can result in pain, weakness, numbness or difficulty controlling specific muscles." http://encyclopedia.thefreedictionary.com/radiculopathy. L5 is the fifth lumbar vertebrae. MedicineNet.com, http://www.medterms.com/script/main/art.asp?articlekey=8768.

In May 2001, Rose examined King again. R. 541. Rose indicated that King was suffering from significant pain in both ankles as well as in her left knee. *Id.* Rose stated that King was unable to walk more than two or three blocks or stand for any prolonged amount of time without experiencing pain. R. 541. Rose determined that King was "totally disabled … [and] unable to work at any job currently available to her in the marketplace." *Id.*

On February 21, 2002, Rose performed arthroscopic surgery on King's left knee. R. 676, 703-04. In March 2003, Rose examined King and observed that King had difficulty standing from a seated position. R. 674. Rose's impression was that King was suffering from lateral ligament complex sprain of the left ankle, right ankle sprain which continued to be symptomatic and lumbar radiculopathy secondary to multiple bulging discs. R. 676. In June 2003, Rose recommended that King wear air casts on both ankles. R. 678. In October 2003, Rose determined King continued to suffer from the same conditions. R. 684. He also stated that King should avoid any forceful or strenuous activities and that she should be cautious while walking on slippery or uneven surfaces. R. 684. In 2004, Rose performed arthroscopic surgery on King's left ankle and foot. R. 1550, 1569.

In November 1998, Rose completed a physical residual functional capacity questionnaire regarding King. R. 344-49. Rose categorized King's pain as chronic and stated that the pain worsens with a change in the weather and with any extended activity. R. 344. Rose stated that King could walk no more than two blocks without rest, could sit no more than 20 minutes and stand no longer than 15 minutes at one time and that she should not sit or stand more than two hours in one work day. R. 346. Rose indicated that King could carry no more than ten pounds. R. 347.

On May 28, 2003, Rose completed a bilateral manual dexterity impairment questionnaire. R. 389-94. Rose indicated that King should never lift or carry more than ten pounds. R. 391. Rose indicated that he believed King's symptoms and functional limitations would persist for at least an additional 12 months. R. 392-93.

In 2004, Rose completed a multiple impairment questionnaire with regard to King. R. 663. Rose rated King's level of pain at an eight on a ten point scale. R. 665. Rose indicated that King should not sit, stand or walk for more than two hours every day and that she could not sit continuously in a work setting. R. 665. Rose indicated that King should not lift or carry more than five pounds. R. 666.

2.      *Dr. Charles Kaplan -- Treating Rehabilitation Physician*

Starting in October 2001 and extending at least through January 2003, Dr. Charles Kaplan, Diplomate in Physical Medicine and Rehabilitation, treated King. R. 629-649. Kaplan's impressions were that the results of King's work-related injury were that she suffered from left rotator cuff impingement and possible tear, carpal tunnel syndrome on the left, cervical brachial syndrome and a herniated cervical disc.[4] R. 630. Kaplan determined as early as April 2002 and as late as January 2003 that King was totally disabled. R. 649.

On September 3, 2002, Kaplan completed a multiple impairments questionnaire with regard to King. R. 381-87. Kaplan categorized King's pain as constant. R. 382. Kaplan stated that King should not sit for more than two hours during the work day and should not walk for more than an hour. R. 382. Kaplan indicated it was medically necessary for King to not sit continuously in a work setting. R. 382.

---

[4]      Cervical brachial syndrome is one that relates to the neck and arm. *American Heritage Medical Dictionary* (2009), http://medical-dictionary.thefreedictionary.com/cervicobrachial.

3. *Dr. Christopher Kyriakides -- Treating Osteopathic Doctor*

From March 2001 through January 2005, Dr. Christopher Kyriakides, an osteopathic doctor, examined King at least fifty times. R. 530, 1525. Kyriakides observed that King walked with a severe anatalgic gait favoring her left lower leg.[5] R. 538-39. In addition to King's ankle injuries, Kyriakides's impression was that King was suffering from consequential left knee, lower back and right ankle injuries. R. 539. Kyriakides indicated that King should not sit for more than four hours and not stand for more than one hour. R. 532. Kyriakides determined that it would be medically necessary for King to not sit continuously in a work setting. R. 532. Kyriakides indicated that King should not carry or lift more than five pounds. R. 533. Kyriakides described that King frequently experienced pain, fatigue and other symptoms which interfered with attention and concentration. R. 535. In November 2001 and as late as January 2005, Kyriakides determined that King remained totally disabled and that, in fact, she had a "total, permanent disability." R. 540, 621.

4. *Dr. Roger Antoine -- Consulting Orthopedic Surgeon*

On July 3, 1997, Dr. Roger Antoine, an impartial consultant and orthopedic surgeon, performed an independent medical evaluation in connection with King's chief complaint of left shoulder pain and numbness in the left hand. R. 263, 413. Antoine observed that King could only stand up for a few minutes and that she walked with a limp in her left leg. R. 263. Antoine indicated that King "can barely stand up and walk on her toes." R. 263. As to King's left shoulder, Antoine indicated that King suffered from a decreased range of motion. R.

---

[5] An antalgic gait is a "limp adopted so as to avoid pain on weight-bearing structures, characterized by a very short stance phase." *American Heritage Medical Dictionary* (2009), http://medical-dictionary.thefreedictionary.com/antalgic+gait.

264. Antoine indicated that King's muscle strength was at a minimum 4/5. *Id.* Antoine also stated there was swelling and stiffness in King's left ankle and that she could not move it without pain. *Id.* Antoine indicated that his impression was that King suffered from a post contusion of the left shoulder, post severe sprain of the left ankle as well as a history of left carpal tunnel syndrome. R. 265. Antoine stated that, in his opinion, King could not stand for a long period of time, walk for long distances, reach over her head with her left hand without difficulty and suffers from decreased range of motion at the left shoulder. R. 265.

5. *Dr. Suzanne Wenderoth -- Treating Internist*

Dr. Suzanne Wenderoth, an internist, saw King between January 10, 2000 and April 25, 2001. R. 491. Wenderoth is neither a disability physician nor a rheumatologist and, as she stated herself, she did not treat King's chronic pain issues. R. 987. Wenderoth determined that King was suffering from left wrist pain, left knee pain and left shoulder pain. *Id.* Wenderoth determined that King could sit for three to four hours in an eight-hour day and stand or walk for two to three hours. R. 493. Wenderoth stated that King could frequently lift and carry up to five pounds and occasionally lift and carry up to ten. R. 494. Wenderoth also stated that King had significantly limited ability to grasp, turn and twist objects. *Id.*

6. *Dr. Kyung Seo -- Consulting Physician*

On January 27, 1998, Dr. Kyung Seo performed a consultative examination of King. R. 284-85. Seo determined that King could sit without much difficulty and stand for 30 minutes without interruption. R. 285. Seo indicated that King could walk a couple of blocks without interruption and would be able to lift and carry approximately 15 pounds. *Id.* Seo noted

that King had no difficulty standing up from the sitting position and that her fine motor coordination of both hands was essentially normal.  R. 284.

6.    *State Agency Medical Consultants*

On August 1, 1997, Dr. C. Ladopoulos, a state agency medical consultant, reviewed the medical evidence contained in King's records as of the day of his review.  R. 267-73.  Ladopoulos assessed, from the record, that King could lift and carry up to 20 pounds occasionally and could stand or walk for about six hours of an eight-hour work day.  R. 267.  Ladopoulos noted that King walked with a limp in her left leg.  R. 268.  Ladopoulous did not examine King.

On October 14, 1997, Dr. J. Pauporte, a state agency medical consultant, reviewed the medical evidence contained in King's records as of October 1997.  R. 276-83.  Pauporte determined that King suffered from decreased strength in her left ankle, which was swollen.  Pauporte assessed that King could occasionally lift and carry ten pounds and that she could stand or work for at least two hours of an eight-hour work day.  R. 277.  Pauporte did not examine King.

7.    *Dr. Mario Nelson*

On July 27, 1998, Dr. Mario Nelson, a physical medicine specialist, examined King and conducted EMG and nerve conduction velocity studies of her lower extremities.  R. 364-65.  Nelson saw King on one occasion in July 1998 and determined that there was tenderness and swelling and she had pain upon force in the left ankle.  R. 364.  Nelson also said that King had full range of motion, but that King also had swelling in the left knee.  R. 364.  Nelson determined that the EMG results were consistent with a left L5 radiculopathy.  R. 365.

11

8.      *Dr. Maurice Klein -- Consulting Physician*

On March 18, 2005, Dr. Maurice Klein performed a consultative examination of

King.  R. 911.  Klein observed that King walked very slowly and with a distinct limp favoring

her left leg.  R. 912.  Klein's impressions were that King was suffering from lumbar disc disease,

right ankle sprain, bilateral pain in the knees and thighs, right shoulder and neck pain and other

ailments based on her medical history.  R. 913-14.  Klein determined that King suffered from

"moderate limitation to sitting, standing, walking, climbing stairs, bending, lifting, carrying,

kneeling, reaching, and handling objects."  R. 914.

9.      *Medical Testimony at Hearings*

Dr. Louis Lombardi, a medical expert who did not examine King, testified at the

hearing held on April 30, 2008.  R. 1509.  Lombardi did not comment as to King's residual

functional capacity.  Dr. Donald Goldman, a medical expert on the list of experts maintained by

the Office of Hearings and Appeals, testified at the hearing held on March 10, 2008.  R. 1565.

Goldman testified that Rose and Kyriakides's descriptions of King's limitations as to her lumbar

spine and left ankle are consistent with their findings.  R. 1577.  Dr. Howard Finkelstein testified

at King's first ALJ hearing on April 22, 1998.  R. 1676.  Finkelstein testified that, based on his

review of King's medical file that King could sit for six hours a day, stand and walk for two and

lift 20 pounds and carry ten.  R. 1676.

DISCUSSION

A.      *The Legal Standard*

Under 42 U.S.C. § 405(g), I review the Commissioner's decision to determine

whether it was "'supported by substantial evidence in the record as a whole or [was] based on an

erroneous legal standard.'"  *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (quoting *Beauvoir*

*v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997)).  Substantial evidence "means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v.*

*Perales,* 402 U.S. 389, 401 (1971).

        Under the Social Security Act, King is entitled to DDI benefits if "by reason of [a]

medically determined physical or mental impairment … which has lasted for a continuous period

of not less than 12 months," 42 U.S.C. § 423(d)(1)(A), she "is not only unable to do [her]

previous work but cannot, considering [her] age, education, and work experience, engage in any

other kind of substantial gainful work which exists in the national economy," *id.* at § 423(d)

(2)(A).  The Commissioner decides whether the claimant is disabled within the meaning of the

Act.  20 C.F.R. § 416.927(e)(1).

        The Social Security Administration's regulations break down the inquiry into a

five-step process:

> First, the Commissioner considers whether the claimant is
> currently engaged in substantial gainful activity.  If he is not, the
> Commissioner next considers whether the claimant has a severe
> impairment which significantly limits his physical or mental ability
> to do basic work activities.  If the claimant suffers such an
> impairment, the third inquiry is whether, based solely on medical
> evidence, the claimant has an impairment which is listed in
> Appendix 1 of the regulations.  If the claimant has such an
> impairment, the Commissioner will consider him disabled without
> considering vocational factors such as age, education, and work
> experience; the Commissioner presumes that a claimant who is
> afflicted with a listed impairment is unable to perform substantial
> gainful activity.  Assuming the claimant does not have a listed
> impairment, the fourth inquiry is whether, despite the claimant's
> severe impairment, he has the residual functional capacity to
> perform his past work.  Finally, if the claimant is unable to perform
> his past work, the Commissioner then determines whether there is
> other work which the claimant could perform.

*DeChirico v. Callahan*, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (internal quotation marks, brackets and ellipsis omitted); *see also* 20 C.F.R. § 416.920(a)(4) (setting forth this process).

In making the required determinations, the Commissioner must consider (1) the objective medical facts; (2) the medical opinions of the examining or treating physicians; (3) the subjective evidence of the claimant's symptoms submitted by the claimant, his family and others; and (4) the claimant's educational background, age and work experience. *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983). Further, the ALJ conducting the administrative hearing has an affirmative duty to investigate facts and develop the record where necessary to adequately assess the basis for granting or denying benefits. *See* 20 C.F.R. § 416.1400(b) (expressly providing that the Social Security Administration "conduct the administrative review process in an informal, nonadversary manner"); *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000) ("Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits . . ."); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). If "the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose," it is appropriate for a court to reverse an ALJ's decision and order the payment of benefits. *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980).

B.      *The ALJ's Decision*

Applying the five-step sequential evaluation prescribed by 20 C.F.R. § 416.920(a)(4), the ALJ found, at step one, that King had not engaged in substantial gainful activity since January 15, 1997. R. 409. At step two, he found that King's "severe" impairments included: residual status post work-related accidents. *Id.* The ALJ found at step three that

14

King's impairment or combination of impairments did not equal the severity of any conditions in the Listings of Impairments contained in Appendix 1 to Subpart P of Part 404 of the Social Security Administration's regulations. *Id.* As for steps four and five, the ALJ found that King has not retained the residual functional capacity ("RFC") to perform her past work, but that she had the RFC to perform the full range of sedentary work as defined by 20 C.F.R. § 404.1567(a). *Id.*

C.    *The ALJ's Evaluation of the Medical Evidence*

   1.    *The ALJ's Decision to Discredit the Findings of King's Three Treating Doctors*

          While the final determination as to disability rests with the Commissioner, 20 C.F.R. § 416.927(e)(1), a treating physician's opinion about a claimant's impairments is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(d)(2); *see also Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) (upholding these regulations). King argues that the ALJ erroneously failed to accord controlling weight to the findings of Rose, Kyriakides and Kaplan, her treating physicians. The Commissioner argues that the ALJ properly declined to accord these treating physicians' assessments controlling weight because they were not well-supported by objective medical evidence and were inconsistent with other evidence of record.

          When the Commissioner does not give a treating physician's opinion controlling weight, the weight given to that opinion must be determined by: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the

opinion is from a specialist; and (v) other relevant factors." *Schaal*, 134 F.3d at 503 (citing 20

C.F.R. § 416.927(d)(2)). The Commissioner must set forth "good reasons" for failing to accord

the opinions of a treating physician controlling weight. *See, e.g.*, *Halloran v. Barnhart*, 362 F.3d

28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided

'good reasons' for the weight given to a treating physicians [sic] opinion and we will continue

remanding when we encounter opinions from ALJ's that do not comprehensively set forth

reasons for the weight assigned to a treating physician's opinion."). The ALJ is required to

explain the weight given to treating source opinions when they are found not to be controlling,

and to provide some explanation for rejecting them. *See Snell v. Apfel*, 177 F.3d 128, 133-34 (2d

Cir. 1999); *see also Heath v. Astrue*, No 07-CV-1238, 2008 WL 1850649, at *2 (E.D.N.Y. Apr.

24, 2008) ("Where there is conflicting evidence on the issue of disability, 'it is for the [Social

Security Administration], and not this court, to weigh the conflicting evidence in the record,'

particularly when the court 'cannot say with certainty what weight should be assigned ... to the

opinion of plaintiff's treating physician.'") (*quoting Schaal*, 134 F.3d at 504 (alterations in

original)).

    The parties agree that, for the purposes of King's claim, Rose, Kyriakides and

Kaplan are her treating physicians and were treating King during her claimed period of

disability. Although Rose, Kyriakides and Kaplan each determined King was totally disabled,

the ALJ decided not to give their opinions controlling weight because (1) Rose stated that King

should refrain from strenuous and forceful activity, which is not consistent with his assessments;

(2) "the findings and assessments of the impartial consultants and the assessment of the medical

consultant, which are consistent with other evidence, contradict these assessments"; (3) the three

doctors' assessments "are grossly exaggerated because those assessments would mean [King] was non-ambulatory and the record establishes this is not the case" and (4) their opinions are contradicted by medical findings that revealed King "had good muscle strength and grip and had normal neurovascular assessment." R. 418. I conclude that the ALJ did not provide good reasons for not giving Rose, Kyriakides and Kaplan's opinions controlling weight. Moreover, he failed even to mention the weight these opinions were given.

The ALJ states that Rose's recommendation in several of his letters that King should refrain from strenuous and forceful activity is inconsistent with his determination that King is totally disabled. The ALJ determined that such a recommendation does not indicate that King could not perform sedentary work. But Rose actually stated that King should avoid *any type* of strenuous or forceful activity, which deserves a more expansive interpretation than that given by the ALJ, R. 354, especially when read in conjunction with his conclusion that King was totally disabled. In addition, Rose specified that King should refrain from any heavy lifting or strenuous activity to ensure she does not re-injure or re-inflame her ankle, R. 361, which would presumably prolong King's disability even further and increase her pain. The ALJ should not have interpreted this instruction as a statement that actions other than heavy lifting or strenuous activity could be taken without significant pain.

Further, in the course of Rose's at least six years of treating King, there is ample evidence to support his diagnoses and clinical findings regarding functional limitation. First, there are Rose's own statements. During his treatment of her, Rose consistently determined that King suffered from: (1) status post lateral ligament complex rupture with tenosynovitis of the hallux longus of the left ankle with possible intra-articular injury; (2) possible tibial tendon

17

rupture of the right ankle; (3) possible internal derangement of the left knee involving the medial meniscus with sural nerve entrapment secondary to a transfer lesion and (4) L5 radiculopathy manifested into the left lower extremity. R. 249-347; 541, 674-684. Rose repeatedly suggested that King use elevation and a heating pad for her pain, 20 minutes on and 20 minutes off. R. 243, 244, 248. In November 1998, Rose completed a physical RFC questionnaire and stated that King's pain was chronic and would worsen with any extended activity and any change in weather. R. 344. Rose stated that King could walk no more than two blocks without rest, could sit no more than 20 minutes and stand no longer than 15 minutes at one time. R. 346. In May 2001, Rose again stated that King could not walk more than two or three blocks or stand for any prolonged amount of time without experiencing pain. R. 541. In 2002, almost seven years after King's initial injury, Rose performed arthroscopic surgery on King's left knee. R. 676, 703-04. All of the foregoing recommendations, descriptions of King's conditions, diagnoses and treatment support Rose's opinions that King was totally disabled.

       Furthermore, there are two additional treating physicians who also determined King was disabled, each of whom confirmed the findings of Rose. Kaplan determined that King had a herniated disc and suffered from carpal tunnel with a possible tear in her left rotator cuff. Kyriakides observed that King not only suffered from the ankle injuries described by Rose, but that she had consequently left knee, low back and right ankle injuries. Antoine further confirmed that he observed that King walked with a limp. Both Kaplan and Kyriakides determined that King suffered from consistent pain. In fact, Rose, Kyriakides, Kaplan, Antoine and Wenderoth all stated that King was in pain.

The ALJ's second, third and fourth reasons for rejecting the statements of King's three treating physicians are that their opinions are contradicted by the other evidence in the record. However, the record is replete with evidence supporting the conclusions of King's treating physicians' opinions.

The ALJ first indicated that King's muscle grip was assessed as normal, citing the opinion of Antoine, an impartial consultant and orthopedist. It is true that Antoine concluded that the muscle strength of King's shoulders and ankles was at least a 4/5, but he also stated that King walked with a limp and could "barely stand up and walk on her toes." R. 263. Antoine noted that King could not move her ankle without pain and that she suffered from a decreased range of motion. Further, Antoine determined that King could not stand or walk for a long period of time or reach over head with her left hand without difficulty. These conclusions, in large part, confirm the opinions of Rose, Kyriakides and Kaplan. In short, King's muscle strength is hardly the only consideration in determining whether she was disabled -- her pain in completing most tasks required by sedentary employment must also be considered.

The ALJ also disregarded testimony given by Goldman. Goldman testified that the description of King's limitations given by Rose and Kyriakides were consistent with clinical tests and diagnostic tests. The ALJ, however, used his own interpretation of King's diagnostic tests to determine that Goldman's testimony was contradicted. The ALJ cannot supplant his own interpretation of medical tests for those of three medically trained doctors.

The ALJ also indicated his reliance on the opinions of Seo and Nelson. Seo's evaluation was conducted in January 1998 and Nelson's in July 1998, prior to any of the questionnaires completed by Rose, Kyriakides or Kaplan. While it is certainly appropriate to

consider prior physicians' statements, giving them greater weight than a treating physician's more recent findings without additional explanation amounts to legal error. In addition, their determinations that King did not have a decreased range of motion are contradicted by at least *four* physicians, three of whom are King's treating physicians. Further, Seo and Nelson's evaluation are not to be accorded undue weight since they did not treat King, but rather examined her on just one occasion.

The ALJ also indicated in his decision that Wenderoth was a "treating source" and appeared to rely on her judgment that King had "normal muscles, normal grip, strength and reflexes." R. 416. But Wenderoth herself stated that she is not a disability physician or a rheumatologist and that she was not treating King for any complaints of chronic pain. Rather, Wenderoth was King's internist, and she treated King for routine issues a few times a year and for depression. Her opinion certainly cannot be given more than the weight due to the opinions of Rose, Kyriakides and Kaplan, who specifically treated King for the disabilities underlying her application for benefits.

Each of King's treating physicians saw her on numerous occasions over the course of her five and one-half year period of disability. Each submitted records of King's visits as well as summaries and evaluations of King's condition. Each independently concluded that King's injuries severely limited King's physical abilities and that she was totally disabled. The opinions of King's three treating physicians are internally consistent and consistent with the record before me. Accordingly, I find that the ALJ's decision to not accord these opinions with controlling weight was not supported by substantial evidence.

2.      *The Adverse Credibility Finding Regarding King's Subjective Symptoms of Pain*

In resolving whether a claimant is disabled, the Commissioner must consider subjective evidence of pain or disability testified to by the claimant.  See 20 C.F.R. § 416.929(a).  However, "[s]tatements about a claimant's pain cannot alone establish disability; there must be medical evidence that shows that the claimant has a medically determinable impairment that could reasonably be expected to produce the pain or other symptoms alleged."  *Davis v. Massanari*, No. 00 Civ. 4330, 2001 WL 1524495, at *6 (S.D.N.Y. Nov. 29, 2001).  In order to assess the scope of any functional limitations resulting from a medically determinable impairment, the Commissioner must evaluate the intensity and persistence of the claimant's subjective symptoms, including pain, considering the claimant's credibility in light of "all of the available evidence."  *Id.* (citing 20 C.F.R. § 416.929(c)(1)); *Sarchese v. Barnhart*, No. 01-CV-2172, 2002 WL 1732802, at *7 (E.D.N.Y. July 19, 2002).  Indeed, the regulations acknowledge that "[s]ince symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, [the ALJ shall] ... carefully consider any other information [that the claimant] may submit about [her] symptoms."  20 C.F.R. § 416.929(c)(3).

Seven factors must be considered in evaluating a claimant's subjective complaints: (1) the individual's daily activities; (2) the location, duration, frequency and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual received or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (*e.g., l*ying flat

on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 416.929(c)(3).

The ALJ has discretion to evaluate a claimant's credibility, and "[i]f the ALJ's decision to ignore plaintiff's subjective complaints of pain is supported by substantial evidence, then this Court must uphold that determination." *Aronis v. Barnhart*, No. 02 Civ. 7660, 2003 WL 22953167, at *7 (S.D.N.Y. Dec. 15, 2003). However, the ALJ must set forth his or her reasons for discounting a plaintiff's subjective complaints with "sufficient specificity to enable [the district court] to decide whether the determination is supported by substantial evidence." *Miller v. Barnhart*, No. 02 Civ. 2777, 2003 WL 749374, at *7 (S.D.N.Y. Mar. 4, 2003) (quotations and citation omitted).

Here, the ALJ's determination that King was not credible is not supported by substantial evidence. The ALJ stated that King's "medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible." R. 417. In support of his finding, the ALJ noted that King noted that she "prepared breakfast for her daughter, took her daughter to school at times, did crossword puzzles, watched television, attended church approximately once a month, and drove a car." *Id.* In addition, the ALJ noted that medical records from Wenderoth show that, in June 2003, King needed a vaccine because she was joining her daughter on a school retreat. *Id.* These records also noted that King was an "unreliable historian." *Id.*

The testimony regarding King's ability to engage in daily activities does not support the ALJ's findings. King stated that she does drive periodically, including to the hearing. R. 1553. However, King clearly stated that she experienced difficulty with the trip, feeling a strain on her back and left shoulder. *Id.* King stated that she does try to "gather [her daughter] a little something for breakfast" and that she occasionally drives her to school. R. 1557. King is a single mother with limited resources -- the fact that she provides her daughter with food and takes her daughter to school occasionally certainly does not impeach her credibility as to the pain she experiences. Also, the fact that King goes to church once a month is certainly not a "daily" activity as contemplated by the regulations. King also stated that she cannot take the train or subway, because the stairs were too much for her and so she is left with only the bus or a car. R. 1563.

As for King being an "extremely unreliable historian," this was the statement of one doctor in October 2003 and there is no reference in the files or testimony about what that statement meant. It does not necessarily mean that the doctor believed King lied about difficulties she was having, but rather the statement could have meant that King does not remember her medical history well.

The ALJ's statement that King was going on a school retreat with her daughter, and needed a vaccine, is otherwise unexplained. The context makes clear that the ALJ inferred that this was inconsistent with King's claim that she was disabled. That may be correct, but it may be wrong as well. The nature, extent and location of the retreat, and King's participation in it, are unknown. As a matter of fairness, the ALJ should have given King an opportunity to

address this obscure note in a physician's records before concluding that it undermined her credibility.

In addition, the ALJ did not mention King's extensive testimony about her pain. King stated she has pain in her left and right ankle, left and right knee, her back, buttocks, neck, shoulders and hands.  R. 1552.  King rated her pain at a seven on a scale of ten.  *Id*.  She stated that the pain affects her ability to lift and carry more than five pounds.  King testified that she could not sit for more than five or six minutes at a time without feeling a great amount of tension in her back.  *Id*.  King stated that she could stand for no more than seven minutes and that she could walk no more than one block before having to stop and rest.  *Id*.  As a result of her injuries, King cannot hold a cup for too long before it slips out of her hand.  *Id*.   Further, King testified that when the weather is too cold or too hot, her symptoms worsen.  R. 1559.

I am mindful of the fact that "'[i]t is the function of the Commissioner, not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of the witnesses, including the claimant.'"  *Sarchese*, 2002 WL 1732802, at *7 (*quoting Aponte v. Sec'y, Dep't of Health & Human Servs*., 728 F.2d 588, 591 (2d Cir. 1984) (second alteration in original) (quotation omitted)).  However, I conclude that the ALJ did not objectively assess the credibility of King, and his stated justifications for finding King to be "not entirely credible" are not supported by substantial evidence and do not constitute sufficient grounds to discount her subjective complaints of pain.

CONCLUSION

I find that the ALJ's decisions to disregard the treating physicians' opinions and to discredit King's testimony were contrary to the controlling regulations and not supported by

24

substantial evidence.  To the contrary, the opinions of her three treating physicians and King's own expressions of the frequency and effects of her pain are supported by the extensive record in this case.  As this is King's eleventh judicial proceeding following her request for DDI benefits over twelve years ago, I find there is no purpose in remanding this case for further evidentiary proceedings.  Accordingly, the Commissioner's motion for judgment on the pleadings is denied. King's motion is granted and the case is remanded solely for the calculation of benefits.

So ordered.

John Gleeson, U.S.D.J.

Dated:          October 14, 2009
                Brooklyn, New York